# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## DANHOFF v FAHIM

Docket No. 163120. Argued January 10, 2024 (Calendar No. 1). Decided July 8, 2024.

Lynda Danhoff filed a medical malpractice action against Daniel K. Fahim, M.D., and others in the Oakland Circuit Court. Lynda's husband, Daniel Danhoff, filed a derivative loss-of-consortium claim. Fahim and Kenneth P. D'Andrea, D.O., a surgical resident, performed a surgical procedure on Lynda known as extreme lateral intrabody fusion (XLIF). Lynda began to experience complications following the procedure, including pain, fever, and elevated body temperature and blood pressure. A CT scan revealed that there was "free air and free material" outside Lynda's colon, and Lynda had to have another surgical procedure to correct this issue. The surgeon performing this procedure observed that Lynda's sigmoid colon was perforated and was leaking stool. Lynda had four more surgeries to correct the perforation, which led to permanent medical conditions. Plaintiffs filed suit, alleging that Fahim and D'Andrea had committed malpractice by perforating Lynda's sigmoid colon during the XLIF procedure. Defendants moved for summary disposition, arguing that plaintiffs had failed to establish the standard of care or causation. The trial court, Nanci J. Grant, J., found that the affidavit of merit submitted by plaintiffs' expert was not sufficiently reliable to admit his testimony because the expert had failed to cite any published medical literature or other authority to support his opinion that defendants had breached the standard of care. Plaintiffs moved for reconsideration and submitted another affidavit from their expert. The trial court denied the motion, concluding that the opinions of plaintiffs' expert still were not supported by reliable principles and methods or by the relevant community of experts. Plaintiffs appealed, and the Court of Appeals, TUKEL, P.J., and RICK, J. (SERVITTO, J., concurring), affirmed in an unpublished per curiam opinion. Plaintiffs applied for leave to appeal in the Michigan Supreme Court, which granted oral argument on the application. 509 Mich 558 (2022). Following oral argument, the Court granted leave to appeal. 511 Mich 966 (2023).

In an opinion by Justice BOLDEN, joined by Chief Justice CLEMENT and Justices BERNSTEIN, CAVANAGH, and WELCH, the Supreme Court *held*:

The trial court abused its discretion by inadequately assessing the reliability of a standard-of-care expert witness without appropriately analyzing the proposed testimony under MRE 702 or the reliability factors of MCL 600.2955.

1. A plaintiff in a medical malpractice action bears the burden of establishing (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Generally, a plaintiff must produce expert testimony to support their position as to the standard of care in their case and that the standard of care was breached. In order to demonstrate that their expert's opinions are admissible, a plaintiff must satisfy the court that the expert is qualified under MRE 702, MCL 600.2955, and MCL 600.2169. The key questions for determining admissibility are whether the expert's opinions are relevant and whether they are sufficiently reliable to support the expert's conclusions. Previously, Michigan used the test set forth in *Frye v United States*, 54 App DC 46 (1923), for determining the admissibility of novel scientific evidence by analyzing whether the proposed expert's opinions were sufficiently established to have gained general acceptance in the expert's field. In 1993, however, the United States Supreme Court recognized that the *Frye* test was displaced by the adoption of the Federal Rules of Evidence, and it adopted a new test for the admission of expert opinion testimony under the federal rules in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579 (1993). Under FRE 702, the trial judge must make a preliminary assessment of whether the proposed expert's testimony is scientifically valid and whether the reasoning and methodology upon which the testimony is based can be applied to the facts in the case. This preliminary assessment is known as the trial court's gatekeeping function. Michigan modified its evidentiary rules in response to *Daubert* and incorporated *Daubert*'s reliability requirements into MRE 702.

2. In two earlier cases, *Edry v Adelman*, 486 Mich 634 (2010), and *Elher v Misra*, 499 Mich 11 (2016), the Michigan Supreme Court was asked to answer the same questions as in this case, but on different facts. In *Edry*, the Court held that MRE 702 incorporates the reliability standards articulated in *Daubert*, which require the trial court to ensure that any scientific testimony or evidence admitted is not only relevant, but reliable. The Court excluded the plaintiff's expert's testimony in *Edry* because the testimony was contradicted by the defendant's expert and by the supportive literature submitted by the defendant. Additionally, the plaintiff failed to provide medical literature in support of her expert's opinion, and the information later submitted by the plaintiff was not peer-reviewed, nor did the plaintiff explain how or whether the information was used by her expert to formulate his opinions. In *Elher*, the Court held that the trial court did not abuse its discretion by excluding the testimony of the plaintiff's standard-of-care expert because the plaintiff had merely pointed to her expert's background and experience to establish his reliability, which is generally insufficient to establish reliability. Further, the plaintiff's opinion was contradicted by both the opinion of the defendant's expert and the published literature submitted by the defendant. The Court held that although peer-reviewed, published literature was not always necessary or sufficient to meet the requirements of MRE 702, the lack of such literature combined with the lack of any other form of support in that case rendered the opinion of the plaintiff's expert unreliable and inadmissible under the rule.

3. Although *Edry* and *Elher* do not determine the outcome of this case, the Court still looks to the legal standards they set forth to assess expert reliability, and pursuant to *Edry* and *Elher*, the test for whether an expert is qualified continues to be found in MRE 702, MCL 600.2955, and MCL 600.2169. The focus in this case was on MRE 702 and MCL 600.2955 because the parties did not dispute the relevance or qualifications of plaintiffs' expert under MCL 600.2169. Neither MRE 702 nor MCL 600.2955 requires a trial court to exclude the testimony of a plaintiff's expert

on the basis of the plaintiff's failure to support their expert's claims with published literature. Instead, MCL 600.2955(1) presents a nonexhaustive list of seven factors that a trial court must consider in determining whether an expert's opinions are reliable, including: (1) whether the opinion and its basis have been subjected to scientific testing and replication; (2) whether the opinion and its basis have been subjected to peer-reviewed publication; (3) the existence of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards; (4) the known or potential error rate of the opinion and its basis; (5) the degree to which the opinion and its basis are generally accepted within the relevant expert community; (6) whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered; and (7) whether the opinion or methodology is relied upon by experts outside of the context of litigation. While published literature may be an important factor in determining reliability, it is not dispositive, and thus its absence does not require finding that the proposed expert testimony is unreliable and therefore inadmissible. Expert testimony is inadmissible when it does not meet the reliability requirements of MRE 702, MCL 600.2955, and MCL 600.2169, not because the testimony was not or could not be supported by peer-reviewed literature. The lower courts erred by focusing so strictly on plaintiffs' inability to support their expert's opinions with published literature such that it was inadmissible under MRE 702. If a lack of supportive medical literature were treated as dispositive when the opinions of a plaintiff's expert were otherwise reliable, patients who experience complications so rare they have not been studied by the academic community or discussed in peer-reviewed publications would not be able to offer admissible expert testimony when seeking legal recourse for their injuries. The avoidance of such a result is why MCL 600.2955 has several factors to be considered in determining reliability.

Reversed and remanded.

Justice BERNSTEIN, concurring, agreed with the majority's result reversing the decision of the Court of Appeals but wrote separately to note that he questioned whether *Edry* and *Elher* were correctly decided and that he remained open to revisiting those decisions in a future case.

Justice ZAHRA, joined by Justice VIVIANO, dissenting, disagreed with the majority's conclusion that the trial court improperly applied MRE 702, MCL 600.2955, *Edry*, and *Elher*. He also disagreed with the majority's characterization of the lower courts' opinions as concluding that the opinions of plaintiffs' expert were unreliable because they were not supported by published medical literature. In Justice ZAHRA's view, the trial court had not excluded the testimony of plaintiffs' expert simply because it was not supported by published medical literature; rather, the trial court had excluded the expert's testimony because the only foundation laid as to the reliability of the testimony was the expert's own opinion, background, and experience, and that foundation was insufficient to establish reliability and admissibility under MRE 702. Further, plaintiffs' expert failed to satisfy any of the seven factors listed in MCL 600.2955(1) that a trial court must consider when determining whether an expert's opinion is reliable. Plaintiffs' expert did not present any evidence in support of his contention that Lynda's injury was the result of medical malpractice; he did not provide evidence that his opinion had been subjected to peer-reviewed publication; he did not provide evidence that there were generally accepted practices or procedures for the XLIF procedure and that defendant had violated them; he did not provide evidence about the known or potential error rate of his opinion; he did not provide evidence that his opinion was

accepted by any other doctor or expert; he did not provide evidence that experts in his field relied on the same basis, i.e., the rarity of the harm, to reach an opinion on malpractice; and he did not provide evidence regarding whether experts in his field relied on his opinion or methodology, both within and outside the context of litigation.  Further, although the majority opinion asserted that the lower courts relied too heavily on the fact that plaintiff's expert did not support his opinion with published medical literature, the majority opinion did not identify any record evidence that the lower courts failed to consider or assert that any of the MCL 600.2955(1) factors supported admission of the testimony.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 8, 2024

STATE OF MICHIGAN

SUPREME COURT

LYNDA DANHOFF and DANIEL
DANHOFF,

        Plaintiffs-Appellants,

v                                   No. 163120

DANIEL K. FAHIM, M.D., and MICHIGAN
HEAD & SPINE INSTITUTE,

        Defendants-Appellees,

and

DANIEL K. FAHIM, M.D., PC, KENNETH
P. D'ANDREA, D.O., and WILLIAM
BEAUMONT HOSPITAL, doing business as
BEAUMONT HOSPITAL-ROYAL OAK,

        Defendants.

BEFORE THE ENTIRE BENCH

BOLDEN, J.

In this medical malpractice case, we must determine whether the trial court properly granted defendants' motion for summary disposition. "A plaintiff in a medical malpractice action must establish (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016) (quotation marks and citation omitted). At issue here is whether plaintiff established the standard of care. Generally, expert testimony is required to establish the standard of care and to demonstrate that the standard of care was breached. *Id*. "The proponent of expert testimony in a medical malpractice case must satisfy the court that the expert is qualified under MRE 702, MCL 600.2955, and MCL 600.2169." *Id*. at 22 (quotation marks and citation omitted).

In particular, this case poses the question of whether an expert in a medical malpractice lawsuit can reliably support their opinion on the standard of care if the adverse event is so rare that published, peer-reviewed medical literature on the subject may not exist. In other words, we must determine whether such an expert is required to support their standard-of-care opinion with scientific literature in order to be reliable.

Consistently with precedent, we hold once again that scientific literature is not always required to support an expert's standard-of-care opinion, but that scientific literature is one of the factors that a trial court should consider when determining whether the opinion is reliable. As we have said before, "peer-reviewed, published literature is not always a necessary or sufficient method of meeting the requirements of MRE 702," thus establishing reliability. *Edry v Adelman*, 486 Mich 634, 641; 786 NW2d 567 (2010). This means that each case will present unique circumstances for a trial court to determine whether the expert's opinion is reliable. In some cases, a lack of supportive literature may

2

be fatal to a plaintiff's expert's reliability. In others, a plaintiff's expert may demonstrate reliability without supportive literature, especially where a complication is rare and there is a dearth of supportive literature available to support the opinion. Nonetheless, consistent with *Elher* and *Edry*, the guidepost for admissibility is reliability, and trial courts must consider MRE 702 as well as the statutory reliability factors presented in MCL 600.2955 when determining if an expert is reliable. Determining that the expert is unreliable and granting summary disposition without first considering all such applicable factors, as the trial court did here, is an abuse of discretion. Accordingly, we reverse.

## I. FACTS AND PROCEDURAL HISTORY

### A. THE INJURY

In 2015, plaintiff-patient Lynda Danhoff[1] sought medical treatment from defendant Dr. Daniel Fahim, M.D., a board-certified neurosurgeon, after she injured her back at work. Plaintiff had her initial consultation with Dr. Fahim at Michigan Head and Spine Institute. Plaintiff and Dr. Fahim agreed that Dr. Fahim would perform a lumbar spinal surgery with instrumentation, known as an extreme lateral intrabody fusion (XLIF) procedure,[2] at Beaumont Hospital through two operations performed over three days.

---

[1] Plaintiff Daniel Danhoff's claim is a derivative loss-of-consortium claim. Therefore, for ease of reference, this opinion will refer to Lynda Danhoff as "plaintiff."

[2] XLIF is a minimally invasive procedure to treat spinal disorders with the goal of reducing long-term back pain or leg pain that is unresponsive to other treatments. See, e.g., University of California San Francisco Health, *Extreme Lateral Interbody Fusion (XLIF)* <https://www.ucsfhealth.org/treatments/extreme-lateral-interbody-fusion> (accessed February 23, 2024) [https://perma.cc/SV59-XVZ7]. It is performed by a surgeon who makes an incision in the side of the body (rather than the back) to access the spinal column through the space between a patient's spinal discs. See *id*.

The first surgery was performed by Dr. Fahim and defendant Dr. Kenneth D'Andrea, D.O., a surgical resident, on December 7, 2015. Dr. Fahim testified that the entire XLIF procedure should be performed in the "retroperitoneal space," an "area of fat that is behind the peritoneum." The retroperitoneal space has several organs including the sigmoid colon, which is of particular relevance in this case. When the procedure is performed correctly, the sigmoid colon should be about 12 to 15 centimeters away from the surgical location. There, the fat and muscle are removed, and a knife is used within the affected spinal disc in the spinal column. Plaintiff's surgery required an operation on the area between the L3 and L4 discs of the lumbar region of her spine. Dr. Fahim believed that the first day of surgery was performed without complications.

Plaintiff experienced pain and fever the next day. Dr. Fahim believed those complications were normal surgical responses and did not have concerns. He performed the second spinal surgery on December 9, 2015, thus concluding the XLIF operation as initially planned.

On December 10, 2015, plaintiff experienced redness at the site of the incision that was made during the first procedure. Plaintiff's body temperature and blood pressure both elevated to the point that she was taken to the hospital's intensive care unit for a CT scan. The CT scan revealed that there was "free air and free material outside the colon."

Plaintiff needed a third procedure to correct this issue. During this procedure, Dr. Anthony Iacco observed that there was a hole in plaintiff's sigmoid colon that was leaking stool. Dr. Iacco cleaned the area by suctioning the stool and performed an ostomy to divert

4

stool away from the sigmoid colon to allow the area to heal.[3]  Once the area was cleaned, Dr. Iacco observed that plaintiff's sigmoid colon was perforated.  Plaintiff had four surgeries over the next six days to correct the perforation.  She was discharged from the hospital on January 6, 2016—30 days after her first procedure.  She complains of continuing medical ramifications that have now become permanent.

## B.  THE LEGAL PROCEEDINGS

Plaintiff and her husband, Daniel, filed this lawsuit against several defendants alleging medical malpractice.[4]  Plaintiff's allegations of medical malpractice all stem from the first procedure on December 7, 2015.  Specifically, plaintiff alleges that during the XLIF procedure performed by Dr. Fahim and Dr. D'Andrea, plaintiff's sigmoid colon was perforated and not repaired, requiring emergency care, additional surgeries, and hospitalization and that her now permanent medical conditions resulted from the alleged malpractice.

---

[3] An ostomy surgery is a procedure that reroutes waste out of the body into a pouch or "ostomy bag" or into an internal surgically created pouch because of a malfunction in the urinary or digestive system.  See United Ostomy Associations of America, Inc., *What Is an Ostomy?*, <https://www.ostomy.org/what-is-an-ostomy/> (accessed February 23, 2024) [https://perma.cc/77RK-YVJK].

[4] Plaintiffs sued several defendants—Dr. Fahim; Michigan Head & Spine Institute; Dr. D'Andrea; Daniel K. Fahim, M.D., P.C.; and William Beaumont Hospital-Royal Oak.  The latter three defendants were dismissed from this lawsuit before the parties submitted their briefs on appeal.  Thus, two defendants—Dr. Fahim and Michigan Head & Spine Institute—remain as defendants active in the lawsuit.

Plaintiff included an affidavit of merit with her complaint, as required by MCL 600.2912d(1).[5] The affidavit of merit was signed by Dr. Christopher Koebbe, M.D., a certified neurosurgeon. Dr. Koebbe averred that, in his opinion, the appropriate standard of care for performing an XLIF procedure is: (1) "[t]o perform an anterior approach procedure with due diligence and care so as not to injure any internal organs;" (2) "[t]o properly monitor and supervise all resident surgeon assistants in the proper technique for exposing the surgical site without causing injury to the surrounding organs;" (3) "[t]o properly expose the surgical site without injury to any of the surrounding internal organs;" (4) "[t]o avoid injuring the patient's colon when performing an anterior approach procedure for lumbar surgery;" and (5) "[t]o diagnose and surgically repair all injuries to the patient's

_____

[5] MCL 600.2912d(1) requires, in pertinent part, that:

> (1) Subject to subsection (2), the plaintiff in an action alleging medical malpractice . . . shall file with the complaint an affidavit of merit signed by a health professional who the plaintiff's attorney reasonably believes meets the requirements for an expert witness under section 2169. The affidavit of merit shall certify that the health professional has reviewed the notice and all medical records supplied to him or her by the plaintiff's attorney concerning the allegations contained in the notice and shall contain a statement of each of the following:

> (a) The applicable standard of practice or care.

> (b) The health professional's opinion that the applicable standard of practice or care was breached by the health professional or health facility receiving the notice.

> (c) The actions that should have been taken or omitted by the health professional or health facility in order to have complied with the applicable standard of practice or care.

> (d) The manner in which the breach of the standard of practice or care was the proximate cause of the injury alleged in the notice.

colon prior to closing the surgical site." The affidavit of merit further averred that the standard of care was breached by the medical professionals negligently failing in each of these five areas. The affidavit offered suggestions of what could have been done differently by the medical professionals to comport with the standard of care.

The case moved on to discovery. In his deposition, Dr. Koebbe was asked questions about the standard of care. The following exchange occurred:

> *Q.* . . . Because there was a hole found in this patient's colon after the surgery by Dr. Fahim—because there was a hole found in the colon as described by the pathologist, does that automatically mean to you that Dr. Fahim or someone violated the standard of care?
>
> *A.* I would say that my position in this case is that the standard of care was violated by the occurrence of a perforation to the colon with this particular surgery by this particular surgical team.
>
> *Q.* So my question is a little broader than that. So is it within your realm of knowledge that holes or perforations of the colon, when in surgical hands, automatically means there's a violation of the standard of care?
>
> *A.* I would contest that perforations to the colon that occur during lumbar spine surgery are extremely rare. I can't say that I've been asked to look at a case particular to that subject matter where I've felt that there was not a breach of the standard of care.
>
> Just because you get a complication doesn't necessarily mean the care was within the standard of care or just because a complication can happen doesn't mean that because it happened, it still meets the standard of care.

Dr. Koebbe was asked whether he did any research to help support his standard-of-care opinions. He replied that he did a single search on PubMed to confirm that the incidence of perforated bowels during XLIF procedures was low.[6] He found "[a] few articles" and

---

[6] PubMed is a free resource through which individuals may search for citations and abstracts of biomedical literature. See National Institutes of Health, National Library of

7

"looked at [their] abstracts[, which] show[ed] the complication is extremely rare, which is what [he] thought it was." These abstracts suggested to Dr. Koebbe that a bowel injury is "an extremely rare complication. It happens less than one percent of [the] time." In sum, Dr. Koebbe's testimony explained that the particular injury sustained by plaintiff was an extremely rare complication that was more likely than not caused by a surgical instrument perforating the colon, an area far enough away from the operative region so as to constitute a breach of the standard of care.

Defendants moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff established neither the standard of care nor causation. The trial court denied the motion as to causation but granted it as to standard of care. The trial court found that Dr. Koebbe's testimony was not sufficiently reliable under MRE 702. The trial court found it important that "[n]othing was presented to the Court that evidenced Dr. Koebbe relying on any published medical journals for his opinion nor did he cite to any authority to support his conclusion that the procedure was performed incorrectly, resulting in the perforation." The trial court noted, however, that "if there is a basis for Dr. Koebbe's testimony of which the Court is unaware, the plaintiffs are invited to file a motion for reconsideration of this opinion."

Plaintiffs moved for reconsideration and supplemented their motion with an additional affidavit from Dr. Koebbe. Dr. Koebbe averred that several medical articles supported the standard-of-care opinions he presented in his affidavit of merit and his deposition testimony. He attached the articles, which supported his conclusion that "a

Medicine, PubMed, *PubMed Overview* <https://pubmed.ncbi.nlm.nih.gov/about/> (accessed February 28, 2024) [https://perma.cc/3ECN-AWK9].

8

bowel injury caused during the type of procedure performed upon Ms. Danhoff is not an acceptable known complication of this procedure but rather is so rare as to only occur as a result of surgical error."

The trial court reviewed the supplemented motion and held that "[e]xpert testimony must be directly supported by reliable principles and methods, and be generally supported by the relevant community of experts." The trial court further reasoned that Dr. Koebbe's testimony and support still did not make the necessary showing, and thus, that *Edry* and *Elher* required granting defendants' motion for summary disposition. So the trial court denied plaintiff's motion for reconsideration.

Plaintiff appealed by right, and the Court of Appeals affirmed. *Danhoff v Fahim*, unpublished per curiam opinion of the Court of Appeals, issued May 6, 2021 (Docket No. 352648). Judge Servitto concurred in the result. *Id*. (SERVITTO, J., concurring), unpub op at 1.[7]

Plaintiff applied for leave to appeal in this Court. We agreed to hear arguments on the application. *Danhoff v Fahim*, 509 Mich 858 (2022). After arguments were heard, we granted leave and asked the parties to address:

> (1) whether this Court's decisions in *Edry v Adelman*, 486 Mich 634 (2010), and *Elher v Misra*, 499 Mich 11 (2016), correctly describe the role of supporting literature in determining the admissibility of expert witness

---

[7] Judge SERVITTO believed that the majority's result was required by *Elher* but that the outcome was unfair because it "leaves plaintiffs, such as the one here, in the impossible position of attempting to prove that their injuries occurred due to substandard care when no published articles on the specifically incurred injury are available to either prove *or* disprove that the applicable standard of care was breached." *Danhoff* (SERVITTO, J., concurring), unpub op at 1-2. We disagree that *Elher* requires such a conclusion for reasons addressed throughout this opinion.

9

testimony on the standard of care in a medical malpractice case; (2) if not, what a plaintiff must demonstrate to support an expert's standard-of-care opinion; and (3) whether the appellants' standard-of-care expert met the standards for determining the reliability of expert testimony and was thus qualified to testify as an expert witness under MRE 702 and MCL 600.2955 or whether a *Daubert* hearing was necessary before making that decision. See *Kumho Tire Corp Ltd v Carmichael*, 526 US 137[; 119 S Ct 1167; 143 L Ed 2d 238] (1999); *General Electric Co v Joiner*, 522 US 136[; 118 S Ct 512; 139 L Ed 2d 508] (1997); *Daubert v Merrell Dow Pharm, Inc*, 509 US 579[; 113 S Ct 2786; 125 L Ed 2d 469] (1993); *Elher*; *Edry*. [*Danhoff v Fahim*, 511 Mich 966, 966 (2023).]

## II. ANALYSIS

### A. STANDARD OF REVIEW

This case asks us to review whether the trial court properly granted defendants' motion for summary disposition. On appeal, we review grants and denials of summary disposition de novo. *Ray v Swager*, 501 Mich 52, 61-62; 903 NW2d 366 (2017). The proper interpretation of statutes and the Michigan Rules of Evidence is also reviewed de novo. *Waknin v Chamberlain*, 467 Mich 329, 332; 653 NW2d 176 (2002). De novo review means that this Court independently reviews the issue without deference to the lower court. *People v Posey*, 512 Mich 317, 332; 1 NW3d 101 (2023) (opinion by BOLDEN, J.), citing *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

Defendants' motion for summary disposition was filed under MCR 2.116(C)(10). Such a motion tests the factual sufficiency of the claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). A trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. *Id*. A motion for summary disposition may only be granted on this basis when there is no genuine issue of material fact. *Id*. " 'A genuine issue of material fact exists when the

10

record leaves open an issue upon which reasonable minds might differ.' " *Id.*, quoting *Johnson v VanderKooi*, 502 Mich 751, 761; 918 NW2d 785 (2018).

This case also presents an evidentiary issue—whether the trial court properly concluded that plaintiff's expert's testimony was unreliable and thus, inadmissible. See *Edry*, 486 Mich at 639. Evidentiary issues are reviewed for an abuse of discretion. *Id.*, citing *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Woodman v Dep't of Corrections*, 511 Mich 427, 439; 999 NW2d 463 (2023), citing *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). "A trial court necessarily abuses its discretion when it makes an error of law." *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013).

## B. RELIABILITY OF A MEDICAL EXPERT'S STANDARD-OF-CARE OPINION

A plaintiff in a medical malpractice action bears the burden of establishing " '(1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury.' " *Elher*, 499 Mich at 21, quoting *Locke v Pachtman*, 446 Mich 216, 222; 521 NW2d 786 (1994). Generally, a plaintiff must produce expert testimony to support their position as to the standard of care in their case and that the standard was breached. *Elher*, 499 Mich at 21.[8] The proponent of the evidence—in this case, plaintiff—bears the burden of demonstrating

---

[8] An exception to this general requirement has been recognized by this Court when "the professional's breach of the standard of care is so obvious that it is within the common knowledge and experience of an ordinary layperson." *Elher*, 499 Mich at 21-22. The parties do not dispute that expert testimony is required to support the standard of care in this case, so we consider that exception to be inapplicable.

11

the relevance and admissibility of the expert's opinions. *Id*. at 22, citing *Edry*, 486 Mich at 639.[9] To do so, plaintiff " 'must satisfy the court that the expert is qualified under MRE 702, MCL 600.2955 and MCL 600.2169.' " *Elher*, 499 Mich at 22, quoting *Clerc v Chippewa Co War Mem Hosp*, 477 Mich 1067, 1067 (2007).[10]

Because the parties do not dispute the relevance of Dr. Koebbe's testimony or Dr. Koebbe's qualifications under MCL 600.2169, our focus is on whether the trial court properly assessed the reliability of his testimony under MRE 702 and MCL 600.2955. These statutory and evidentiary guideposts are heavily inspired by federal law. The evolution of the federal expert witness doctrine is important for understanding Michigan's approach.

For decades, the majority of jurisdictions in the United States determined admissibility of novel scientific evidence by analyzing whether the proposed expert's opinion was "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v United States*, 54 App DC 46, 47; 293 F 1013 (1923); *Daubert*, 509 US at 585 (explaining that the "general acceptance" test was the "dominant standard" for 70 years). This test of general acceptance was colloquially known as the "*Frye* test." Michigan adopted the *Frye* test, and in Michigan, for several decades, the "*Davis-Frye* test" of "general acceptance" governed admissibility. See *People v Davis*, 343 Mich 348; 72 NW2d 269 (1955), abrogation recognized by *Gilbert v DaimlerChrysler*

---

[9] The parties do not dispute whether Dr. Koebbe's testimony would be relevant, so this opinion only focuses on the test for an expert witness's reliability.

[10] Whether Dr. Koebbe meets the qualifications listed in MCL 600.2169 is not disputed. This opinion focuses solely on MRE 702 and MCL 600.2955.

*Corp*, 470 Mich 749, 781-782; 685 NW2d 391 (2004); *People v Young*, 418 Mich 1, 24; 340 NW2d 805 (1983) (holding that a trial court erred by not holding a *Davis-Frye* hearing to determine whether an expert's testimony had achieved general scientific acceptance).

However, in 1993, the United States Supreme Court recognized that the *Frye* test was displaced by the adoption of the Federal Rules of Evidence, which contained a new rule regarding admissibility of expert testimony: FRE 702. Accordingly, the Supreme Court adopted a new test for admissibility of expert witness testimony that was consistent with FRE 702. *Daubert*, 509 US at 587, 589. That test requires the trial judge to make a preliminary assessment of whether the proposed expert's testimony is scientifically valid and whether the reasoning and methodology upon which the expert bases their testimony can be applied to the facts in the case. *Id*. at 592-593. This preliminary assessment is known as the trial court's gatekeeping function. The specific inquiry is flexible based on the circumstances of each case but may include a determination that the expert's theory or the techniques used to generate that theory—but not the expert's conclusions—can be tested, has been subjected to peer review and publication, has a known or potential error rate, or is generally accepted among the scientific community. *Id*. at 593-594. In other words, before expert testimony may be admitted at trial, the plaintiff must prove that the expert's testimony is relevant and reliable.

Shortly after *Daubert* was decided, the United States Supreme Court opined further on the role of both trial and appellate courts when reviewing proffered expert opinions. The Court held that decisions to admit or exclude scientific evidence are reviewed for an abuse of discretion. *Joiner*, 522 US at 146. Further, a trial court is not required to admit evidence that has a scientific basis but is only connected to data by the ipse dixit of the

13

expert. *Id*. In addition, the Court clarified that the gatekeeping function performed by trial courts applies to all expert testimony, rather than to only a limited subset of scientific expert testimony. *Kumho Tire Corp*, 526 US at 141. Although the *Daubert* gatekeeping function applies to all experts, the list of factors in *Daubert* is flexible and nonexhaustive: "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id*.

In response to *Daubert*, and to effectuate its principles within this state, Michigan modified its own evidentiary rules. In particular, MRE 702 expressly incorporated *Daubert*'s reliability requirements. *Gilbert*, 470 Mich at 781 ("MRE 702 has since been amended explicitly to incorporate *Daubert*'s standards of reliability. But this modification of MRE 702 changes only the factors that a court may consider in determining whether expert opinion evidence is admissible. It has not altered the court's fundamental duty of ensuring that *all* expert opinion testimony—regardless of whether the testimony is based on 'novel' science—is reliable.").

As discussed earlier, MRE 702 governs testimony given by expert witnesses.[11] It guides the admissibility of the testimony of medical experts in medical malpractice litigation who aver in affidavits of merit as to the applicable medical standard of care and whether that standard of care was breached. See *Craig*, 471 Mich at 85 . Former MRE 702 provided:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to

---

[11] MRE 702 was updated effective May 1, 2024. 513 Mich ___ (March 27, 2024). However, a prior version of MRE 702 is at issue in this case. See 469 Mich cxci (2003). Therefore, this opinion's analysis relies on that previous version of the rule.

14

determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Further guidance as to the reliability of medical expert testimony comes from MCL 600.2955. That statute expresses that the keys to admissibility are relevance and reliability. It provides, in relevant part:

(1) In an action . . . for injury to a person . . . , a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

15

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

(2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

(3) In an action alleging medical malpractice, the provisions of this section are in addition to, and do not otherwise affect, the criteria for expert testimony provided in section 2169. [MCL 600.2955.]

This background brings us to two prior medical malpractice cases that required us to, like here, determine whether the testimony of a medical expert who presented an affidavit of merit to describe the standard of care and its potential breach was sufficiently reliable to be admissible.

## C. *EDRY* AND *ELHER*

In 2010, this Court was asked whether the trial court abused its discretion by granting summary disposition in the defendants' favor by determining that the testimony of the plaintiff's medical expert was unreliable and therefore inadmissible at trial. See *Edry*, 486 Mich 634. In *Edry*, the plaintiff filed a medical malpractice action against the defendant-physician and his professional corporation for the alleged failure to test for cancer when the plaintiff brought to the defendants' attention a lump which was later determined to be invasive cancer. *Id*. at 636. The plaintiff's medical expert was Dr. Barry Singer, who testified that the plaintiff's delayed diagnosis resulted in a greatly reduced probability of survival, from a 95% to a 20% survival rate. *Id*. at 637. Dr. Singer acknowledged that the American Joint Cancer Commission (AJCC) was authoritative on cancer survival rates and that the AJCC reported a 60% survival rate for patients like the plaintiff. *Id*. However, Dr. Singer felt that the AJCC's reported survival rate did not apply

16

to the plaintiff's case because the plaintiff's cancer had spread to 16 lymph nodes but the AJCC survival rate was based on cancer that had spread to four lymph nodes. *Id*. In his deposition, Dr. Singer claimed that there were textbooks and journal articles supporting his theory, but the plaintiff did not produce those supportive sources. *Id*. The defendants' expert testified that the AJCC presented the correct survival rate, that it was medically improper to use the number of affected lymph nodes as a predictor of patient survival, and that Dr. Singer's testimony could not be substantiated by any medical evidence or acceptance within the medical community. *Id*. at 638. The defendants moved for summary disposition, which was ultimately granted by the trial court. *Id*.

We held that MRE 702 incorporates the reliability standards articulated in *Daubert*, through which " 'the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.' " *Id*. at 639-640, quoting *Daubert*, 509 US at 589. A lack of supporting literature is an important but not dispositive factor in determining whether a medical malpractice plaintiff's expert's testimony is admissible. *Edry*, 486 Mich at 640. Under this standard, Dr. Singer's testimony failed to meet the MRE 702 requirements and was inadmissible for several reasons. *Id*. First, Dr. Singer's testimony was contradicted by the defendant's expert and the supportive literature that the defendant had submitted. *Id*. Second, the plaintiff did not provide medical literature as evidence in support of her expert's opinion. *Id*. Third, although the plaintiff eventually submitted some information from publicly available websites, the information was not peer-reviewed and no explanation was given by the plaintiff as to how or whether the information was used to formulate Dr. Singer's opinions. *Id*. at 640-641. We noted that

> [w]hile peer-reviewed, published literature is not always a necessary or sufficient method of meeting the requirements of MRE 702, in this case the lack of supporting literature, *combined with the lack of any other form of support* for Dr. Singer's opinion, renders his opinion unreliable and inadmissible under MRE 702. [*Id*. at 641 (emphasis added).]

The plaintiff did not meet her burden of demonstrating admissibility because, "[u]nder MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Id*. at 642.

Six years later, we provided further guidance on this question. See *Elher*, 499 Mich 11. In *Elher*, the plaintiff underwent a procedure to remove her gallbladder and sued in medical malpractice, alleging that the defendant-physician breached the standard of care by clipping the common bile duct during the procedure. *Id*. at 15. The plaintiff's standard-of-care expert was Dr. Paul Priebe, who agreed that it was "within [his] own self-definition" that the standard of care was breached because "medical literature does not discuss standard of care" in the context of that specific complication, and he conceded that he had never discussed his position with any of his surgical colleagues to reach his conclusions. *Id*. at 14-17. The defendants moved for summary disposition. The motion was supplemented with affidavits from several experts and at least one peer-reviewed publication supporting the defendants' view that clipping the common bile duct is a known potential complication of gallbladder removal and not a breach of the standard of care. *Id*. at 17. The defendants' motion was granted once the trial court concluded that there was no evidence brought forth that Dr. Priebe's opinion was reliable, subject to scientific testing and replication, or had received general acceptance in the medical community. *Id*. at 17-

18

18. The Court of Appeals reversed, concluding that the trial court abused its discretion by excluding Dr. Priebe's testimony. *Id*. at 14.

We reversed, holding that the trial court did not abuse its discretion. *Id*. at 27-28. We recognized that all of the MCL 600.2955 factors may not be relevant in every medical malpractice case, but in *Elher*, the

> [p]laintiff merely pointed to [Dr.] Priebe's background and experience . . . , which is generally not sufficient to argue that an expert's opinion is reliable. [Dr.] Priebe admitted that his opinion was based on his own beliefs, there was no medical literature supporting his opinion, and plaintiff failed to provide any other support for [his] opinion. [*Id*. at 26.]

We further found it notable that Dr. Priebe's opinion was contradicted both by the opinion of the defendant's expert and the published literature that the defendant submitted. *Id*. at 27-28. Importantly, we noted that "[w]hile peer-reviewed, published literature is not always necessary or sufficient to meet the requirements of MRE 702, the lack of supporting literature, combined with the lack of any other form of support, rendered [Dr.] Priebe's opinion unreliable and inadmissible under MRE 702." *Id*. at 27.

### III. APPLICATION

This case asks the same question as *Edry* and *Elher* but with different key facts. Dr. Koebbe has averred and testified that defendants breached the standard of care because the perforation of the patient's bowel is such a rare occurrence during an XLIF procedure that the fact that this happened to plaintiff means that Dr. Fahim's actions must have constituted medical malpractice. Dr. Koebbe has further averred and testified that the condition is so rare that the medical community has not published literature about it in the context of known complications of XLIF procedures. In other words, Dr. Koebbe opined that because

19

a bowel perforation like plaintiff experienced is so rare and so likely to have been caused by a medical instrument in an area it should not have been that it constitutes a breach of the standard of care.[12] This key fact makes a difference.

This case is unlike *Edry*, in which Dr. Singer's testimony regarding the standard of care was properly excluded because it was not based on reliable principles or methods, it was contradicted by the defendant's expert and the AJCC, and no published literature that supported the testimony was admitted as evidence. *Edry*, 486 Mich at 640-641. By contrast, defendant in this case did not provide evidence to challenge Dr. Koebbe's position on the standard of care. And unlike in *Elher*, where the defendant *refuted* Dr. Priebe's claims that there was no medical literature about the standard of care and that the standard of care was breached, defendants in this case have not refuted Dr. Koebbe's testimony that there is no medical literature that discusses the standard of care in relation to the adverse event experienced by plaintiff. *Elher*, 499 Mich at 24-28. The trial court determined that Dr. Koebbe's opinion was unreliable almost exclusively because he did not cite supportive literature without considering whether (1) Dr. Koebbe could have produced such supportive literature, (2) defendant produced any literature or other evidence to contradict

---

[12] In his deposition, Dr. Koebbe testified that he reviewed several abstracts that indicated that the complication was extremely rare. Based upon that information, combined with his knowledge and experience, he inferred that the only likely cause of such a complication was medical malpractice. Dr. Koebbe was making a reasonable inference based on the objective information available about the standard of care, so the trial court was wrong to categorize his opinion as merely ipse dixit and to grant summary disposition on that basis without analyzing the statutory reliability factors.

Dr. Koebbe's opinion,[13] and (3) Dr. Koebbe's opinion was otherwise sufficiently reliable under the factors provided by statute and MRE 702.

While this case is factually distinct from *Edry* and *Ehler*, and their results do not control the outcome of this case, we still look to those cases for the legal standards they set forth to assess expert reliability. Building on those cases, we continue to hold that the test for whether an expert is qualified is found in MRE 702, MCL 600.2955, and MCL 600.2169. See *Elher*, 499 Mich at 22. Neither MRE 702 nor MCL 600.2955 requires a trial court to exclude the testimony of a plaintiff's expert on the basis of the plaintiff's failure to support their expert's claims with published literature. Instead, MCL 600.2955 presents a nonexhaustive list of seven factors that a trial court shall consider when it determines whether an expert's opinions are reliable. Again, those seven factors are:

> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.
>
> (b) Whether the opinion and its basis have been subjected to peer review publication.
>
> (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.
>
> (d) The known or potential error rate of the opinion and its basis.

---

[13] We do not suggest that a defendant in a medical malpractice case *is required* to produce medical literature to refute a plaintiff's standard of care. To hold as much would be contrary to *Edry* and *Elher*, and we do not adopt that position here. See, e.g., *Elher*, 499 Mich at 22-23, citing *Edry*, 486 Mich at 639-640 (explaining that a lack of supporting literature is not dispositive in determining the admissibility of expert witness testimony). Rather, we point out this difference to show that, here—unlike in those cases—nothing suggests that plaintiff could have produced any literature discussing the standard of care in relation to the adverse event experienced by plaintiff.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation. [MCL 600.2955(1).]

Although published literature may be an important factor in determining reliability, it is not a dispositive factor, the absence of which results in a finding that the proposed expert's testimony is unreliable and thus, inadmissible. We have expressly noted as much. *Edry*, 486 Mich at 641 (explaining that "peer-reviewed, published literature is not always a necessary or sufficient method of meeting the requirements of MRE 702"); *Elher*, 499 Mich at 27 (again, explaining that "peer-reviewed, published literature is not always necessary or sufficient to meet the requirements of MRE 702"). Expert testimony is inadmissible when it does not meet the reliability requirements of MRE 702, MCL 600.2955, and MCL 600.2169—not because the expert's testimony was not or could not be supported by peer-reviewed literature.

The lower courts erred by focusing so strictly on plaintiff's inability to support Dr. Koebbe's opinions with published literature. The Court of Appeals, for example, explained that

Dr. Koebbe's standard of care opinion amounted to concluding that the breach of the standard of care was based solely on the unlikelihood of such an injury. Dr. Koebbe's opinion may well be correct, as the trial court noted, as rare injuries during medical procedures are undoubtedly frequently the result of malpractice, and it may even be the case that the more rare a complication, the more likely it was due to malpractice. But Dr. Koebbe's

22

standard of care opinion testimony was based entirely on his . . . assumptions in that regard, solely as a result of his own background and experience. Indeed, at his deposition, Dr. Koebbe testified that he conducted a search for relevant medical literature, but only to confirm his preexisting notion that an injury to the sigmoid colon during such surgery is extremely unusual; Dr. Koebbe could not find any medical literature to support his standard of care opinion that *any* injury to the sigmoid colon during such surgery was *ipso facto* outside the standard of care, and in fact his research supported the opposition conclusion—although such injuries are in fact very rare, they are not nonexistent. Even more to the point, no such articles or other supporting methodology were provided to the trial court before it granted summary disposition to defendants. [*Danhoff*, unpub op at 7.]

In other words, the Court of Appeals majority determined that Dr. Koebbe's testimony was inadmissible due to the lack of literature in support of it; moreover, the majority even went so far as to state that the literature that Dr. Koebbe provided showing that bowel injuries were rare was not supportive of his opinion because that literature showed that bowel injuries do happen, albeit rarely.[14] Treating a lack of supportive medical literature as dispositive that the expert's opinions are unreliable and, therefore, inadmissible, creates a conundrum. If the failure to produce medical literature means that a plaintiff's otherwise reliable expert opinions are inadmissible, patients who experience complications so rare that they are not studied by the academic community or discussed in peer-reviewed publications would not be able to offer admissible expert testimony when seeking legal recourse for their injuries. The avoidance of such a result is why MCL 600.2955 has

---

[14] We do not opine on the ultimate admissibility of Dr. Koebbe's testimony at trial. However, we reverse the trial court's determination because it found Dr. Koebbe's testimony to be unreliable without considering the factors enumerated in MCL 600.2955(1). Moreover, the heightened scrutiny the trial court gave to the lack of medical literature in this situation—where the parties seem to agree that insufficient literature was available to support an expert witness's opinion—strongly suggests that the other factors were not given adequate consideration, and thus, the court's ruling constituted an abuse of discretion.

several factors and does not merely specify that reliability is a product of peer-reviewed medical literature. It is also why we have consistently noted that peer-reviewed medical literature is "not always necessary or sufficient" to meet reliability requirements.[15] *Elher*, 499 Mich at 27; see also *Edry*, 486 Mich at 641.

The lower courts erred by concluding that Dr. Koebbe's opinions were unreliable because they were unsupported by medical literature. Accordingly, we reverse and remand to the trial court to determine whether Dr. Koebbe's opinions were reliable under MRE 702, MCL 600.2955, and MCL 600.2169.

## IV. CONCLUSION

The Court of Appeals erred by affirming the trial court's orders that granted summary disposition to defendants and denied plaintiff's motion for reconsideration. The trial court abused its discretion by inadequately assessing Dr. Koebbe's reliability as a standard-of-care expert without appropriately analyzing MRE 702 or the statutory reliability factors of MCL 600.2955. We reverse the Court of Appeals and remand to the Oakland Circuit Court for proceedings not inconsistent with this opinion.

Kyra H. Bolden
Elizabeth T. Clement
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch

---

[15] Indeed, the Court of Appeals' conclusion—which misunderstood our prior holdings in *Elher* and *Edry* as being decided so narrowly as to require peer-reviewed medical literature to support an expert's opinion—would essentially render meaningless our repeated holdings that such literature is "not always necessary or sufficient."

# STATE OF MICHIGAN

## SUPREME COURT

LYNDA DANHOFF and DANIEL
DANHOFF,

      Plaintiffs-Appellants,

v                                 No. 163120

DANIEL K. FAHIM, M.D., and MICHIGAN
HEAD & SPINE INSTITUTE,

      Defendants-Appellees,

and

DANIEL K. FAHIM, M.D., PC, KENNETH
P. D'ANDREA, D.O., and WILLIAM
BEAUMONT HOSPITAL, doing business as
BEAUMONT HOSPITAL-ROYAL OAK,

      Defendants.

_____

BERNSTEIN, J. (*concurring*).

I agree with the majority's result reversing the decision of the Court of Appeals. I write separately to note that I remain open to revisiting *Edry v Adelman*, 486 Mich 634; 786 NW2d 567 (2010), and *Elher v Misra*, 499 Mich 11; 878 NW2d 790 (2016), in a future case. I continue to question whether those cases were correctly decided. See *Elher*, 499 Mich at 28 (BERNSTEIN, J., dissenting). However, because the parties have not asked us to revisit this caselaw, I decline to do so in this case.

                                          Richard H. Bernstein

LYNDA DANHOFF and DANIEL
DANHOFF,

      Plaintiffs-Appellants,

v                                     No. 163120

DANIEL K. FAHIM, M.D., and MICHIGAN
HEAD & SPINE INSTITUTE,

      Defendants-Appellees,

and

DANIEL K. FAHIM, M.D., PC, KENNETH
P. D'ANDREA, D.O., and WILLIAM
BEAUMONT HOSPITAL, doing business as
BEAUMONT HOSPITAL-ROYAL OAK,

      Defendants.

_____

ZAHRA, J. (*dissenting*).

In this medical malpractice case, we consider whether the trial court abused its discretion by excluding proffered testimony from plaintiff's expert, Dr. Christopher Koebbe, on the applicable standard of care. To establish a prima facie case of medical malpractice, a plaintiff must show: "(1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury."[1] As a general matter, a medical malpractice claim must be

_____

[1] *Locke v Pachtman*, 446 Mich 216, 222; 521 NW2d 786 (1994), citing MCL 600.2912a, the statutory corollary of MRE 702.

supported by expert testimony. The trial court judge is the "gatekeeper" of expert testimony.[2] In this role, a trial court judge must not admit an expert's testimony unless the proponent of the expert demonstrates that: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."[3] The majority opinion properly concludes that MRE 702 and MCL 600.2955[4] govern the admissibility of

---

[2] *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 779-780; 685 NW2d 391 (2004). See also *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 597; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[3] MRE 702.

[4] MCL 600.2955 provides:

(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

2

expert testimony.  The majority opinion also concludes, and I agree, that *Edry v Adelman*[5] and *Elher v Misra*[6] properly interpreted MRE 702 and MCL 600.2955.  Relevant here, this Court held in *Edry* that "while not dispositive, a lack of supporting literature is an important factor in determining the admissibility of expert witness testimony."[7]  This Court concluded, "[w]hile peer-reviewed, published literature is not always a necessary or sufficient method of meeting the requirements of MRE 702, in this case the lack of supporting literature, combined with the lack of any other form of support for [the expert's]

---

       (e) The degree to which the opinion and its basis are generally accepted within the relevant expert community.  As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

       (f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

       (g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

       (2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

       (3) In an action alleging medical malpractice, the provisions of this section are in addition to, and do not otherwise affect, the criteria for expert testimony provided in section 2169.

[5] *Edry v Adelman*, 486 Mich 634; 786 NW2d 567 (2010).

[6] *Elher v Misra*, 499 Mich 11; 878 NW2d 790 (2016).

[7] *Edry*, 486 Mich at 640, citing *Craig v Oakwood Hosp*, 471 Mich 67, 83-84; 684 NW2d 296 (2004).

3

opinion, renders [the] opinion unreliable and inadmissible under MRE 702."[8]  In *Elher*, we reiterated our holding in *Edry*, stating that "[a] lack of supporting literature, while not dispositive, is an important factor in determining the admissibility of expert witness testimony."[9]  We held that

> the circuit court did not abuse its discretion by concluding that [the putative expert's] background and experience were not sufficient to render his opinion reliable in this case when [he] admitted that his opinion was based on his own beliefs, there was no evidence that his opinion was generally accepted within the relevant expert community, [and] there was no peer-reviewed medical literature supporting his opinion[.][10]

I disagree with the conclusion expressed in the majority opinion, that the trial court improperly applied MRE 702, MCL 600.2955, *Edry*, and *Elher*.  I also disagree with the way the majority opinion has framed the issue before this Court.  According to the majority opinion, "[t]he lower courts erred by concluding that [the expert's] opinions were unreliable because they were unsupported by medical literature," and "[t]he trial court abused its discretion by inadequately assessing [the expert's] reliability as a standard-of-care expert without appropriately analyzing MRE 702 or the statutory reliability factors of MCL 600.2955."  But the majority opinion's holding is based on a calumnious misreading of the trial court's opinion and, for all intents and purposes, ignores the trial court's succinct and exceedingly well-reasoned conclusions of law.  Specifically, the majority opinion's conclusion that "[t]he lower courts erred by concluding that [the expert's] opinions were

---

[8] *Edry*, 486 Mich at 641.

[9] *Elher*, 499 Mich at 23.

[10] *Id*. at 27-28.

4

unreliable because they were unsupported by medical literature" is baseless. The trial court excluded Dr. Koebbe's testimony because "[t]he only foundation laid as to the reliability of Dr. Koebbe's testimony was his experience and background, and his own opinion as to how he would have performed the surgery . . . [and] experience and background alone are insufficient to establish reliability and admissibility under MRE 702."[11] Likewise, the Court of Appeals held that "the information before the trial court established that Dr. Koebbe's standard of care opinion was based solely on his own knowledge and experience . . . [and] Michigan has long held that the ipse dixit of an expert is insufficient to establish the standard of care in medical malpractice cases."[12] The record simply does not support the conclusion that either the trial court or the Court of Appeals excluded Dr. Koebbe's opinions merely because they were unsupported by medical literature. Rather, the trial court and the Court of Appeals both concluded that Dr. Koebbe's opinion was inadmissible because it was supported by nothing other than his knowledge and experience. Accordingly, I dissent.

## I. PROCEDURAL HISTORY

I agree with the recitation of facts provided in the majority opinion. In short, plaintiff consented to having two surgeries performed over three days on her lumbar spine with the goal that these procedures would alleviate her chronic back pain. After the second surgery, the area of plaintiff's first surgical incision became inflamed, and plaintiff

---

[11] *Danhoff v Fahim*, unpublished order and opinion of the Oakland Circuit Court, issued November 25, 2019 (Case No. 2018-166129-NH) (*Danhoff I*), p 3.

[12] *Danhoff v Fahim*, unpublished per curiam opinion of the Court of Appeals, issued May 6, 2021 (Docket No. 352648) (*Danhoff III*), p 7.

experienced high blood pressure and a high fever, which required another hospitalization. A CT scan revealed potential stool leakage near plaintiff's colon, which required a third surgery that confirmed plaintiff had a perforated sigmoid colon. Plaintiff eventually brought a medical malpractice claim and retained Dr. Koebbe as her standard-of-care expert. Defendants moved for summary disposition under MCR 2.116(C)(10), arguing that Dr. Koebbe was not qualified to offer expert testimony on the applicable standard of care.[13] In response, plaintiff filed an affidavit from Dr. Koebbe that reiterated his opinion that defendant had committed medical malpractice, causing plaintiff harm.

The trial court properly observed that it " 'had an independent obligation to review *all* expert opinion testimony . . . .' "[14] Specifically, the trial court found that MRE 702 required the trial court to ensure that the opinion testimony " 'was rendered by a "qualified expert," that the testimony would "assist the trier of fact," and, under the rules of evidence in effect during this trial, that the opinion testimony was rooted in "recognized" scientific or technical principles.' "[15] All told, the trial court recognized that it "must determine if

---

[13] See MCL 600.2912a; *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995) (explaining that in a medical malpractice case, the "plaintiff bears the burden of proving . . . the applicable standard of care"). See also *Lince v Monson*, 363 Mich 135, 140; 108 NW2d 845 (1961) ("In a case involving professional service the ordinary layman is not equipped by common knowledge and experience to judge of the skill and competence of that service and determine whether it squares with the standard of such professional practice in the community. For that, the aid of expert testimony from those learned in the profession involved is required.").

[14] *Danhoff I*, unpub op at 3, quoting *Craig*, 471 Mich at 82, citing MRE 702.

[15] *Danhoff I*, unpub op at 3, quoting *Craig*, 471 Mich at 82.

6

Dr. Koebbe's standard-of-care testimony is rooted in recognized scientific or technical principles in order to deem it admissible."[16]

The trial court reviewed Dr. Koebbe's deposition and the parties' pleadings before finding "that *Plaintiffs did not present any foundation as to the reliability and admissibility of Dr. Koebbe's standard of care testimony* as required by MRE 702 and MCL [6]00.2955."[17] The trial court then explained:

> Nothing was presented to the Court that evidenced Dr. Koebbe relying on any published medical journals for his opinion nor did he cite to any authority to support his conclusion that the procedure was performed incorrectly, resulting in the perforation. While he did testify that he reviewed some publications to confirm the rarity of bowel injuries during the procedure, he failed to name these publications and did not present them at his deposition. *The only foundation laid as to the reliability of Dr. Koebbe's testimony was his experience and background, and his own opinion as to how he would have performed the surgery.* The Michigan Supreme Court has held that experience and background alone are insufficient to establish reliability and admissibility under MRE 702. *Edry*, 486 Mich 634 at 639-640. The Court also notes that Dr. Koebbe failed to cite to any established procedure or authority as to the proper way in which an attending physician must supervise a resident physician. Again, he simply pointed to his background and experience.

> \* \* \*

> Therefore, based on the evidence before it, the Court has no choice but to strike Dr. Koebbe's testimony and grant Defendant's Motion.[18]

---

[16] *Danhoff I*, unpub op at 3.

[17] *Id*. (emphasis added).

[18] *Id*. at 4-5 (emphasis added).

7

After granting summary disposition to defendants, the trial court advised plaintiff that "if there is a basis for Dr. Koebbe's testimony of which the Court is unaware, the Plaintiff[] [is] invited to file a motion for reconsideration of this opinion."[19]

Plaintiff accepted the trial court's invitation, promptly moving for reconsideration. Plaintiff submitted an affidavit from Dr. Koebbe that included three abstracts and one published article as attachments.[20] The trial court described the article, saying:

---

[19] *Id*. at 4.

[20] See *Danhoff v Fahim*, unpublished order and opinion of the Oakland Circuit Court, issued January 21, 2020 (Case No. 2018-166129-NH) (*Danhoff II*), p 2. An abstract is a summary of a study that describes the study's purpose, the results of the study, and the author's interpretation of the results. The first abstract plaintiff offered described the results of Japanese researchers who conducted a "[r]etrospective nationwide questionnaire-based survey of complications" in XLIF procedures "during the first 2 years of its use in Japan." Abstract, Fujibayashi et al., *Complications Associated with Lateral Interbody Fusion: Nationwide Survey of 2998 Cases During the First 2 Years of its Use in Japan*, Spine, Vol. 42, No. 19, pp 1478-1484 (October 1, 2017). The first abstract concluded that "[t]he rates of major vascular injury, bowel injury, and surgical site infection were 0.03% [for 2013], 0.03% [for 2014], and .7% [for 2015]"; it said nothing about whether any of the complications were the result of a breach of the standard of care. *Id*. The second abstract plaintiff offered described the results of researchers from the University of South Florida. The purpose of their study "was to evaluate the incidence of visceral, vascular, and wound complications following MIS-LIF [i.e., an XLIF procedure] performed by experienced surgeons." Abstract, Uribe & Deukmedjian, *Visceral, Vascular, & Wound Complications Following Over 13,000 Lateral Interbody Fusions: A Survey Study & Literature Review*, European Spine J, Vol. 24, pp 386-396 (February 27, 2015). The abstract concluded that of 13,004 patients who underwent XLIF procedures, "0.08% experienced a visceral complication (bowel injury)"; it said nothing about whether any of the complications were the result of a breach of the standard of care. See *id*. The third abstract plaintiff offered came from a group of Italian researchers at the Spinal Regional Department of Santorso Hospital in Italy. That abstract described a single case report of "a rare complication of a bowel injury in a 70-year-old male who underwent an L3-4 and L4-5 lateral transpsoas approach for interbody fusion." Abstract, Balsano et al., *A Case Report of a Rare Complication of Bowel Perforation in Extreme Lateral Interbody Fusion*, European Spine J, Vol. 24, pp 405-408 (April 24, 2015). The third abstract did not purport to offer any conclusions on the commonness of bowel injuries in XLIF procedures, and it said nothing

8

[t]he article, published in the Journal of N[eu]roscience, discusses various complications observed when performing the XLIF surgery. The article demonstrates that a bowel injury, such as the one found in Lynda Danhoff, is a very rare complication of the XLIF surgery, occurring between .05-3.8% of the time. The three abstracts attached to Plaintiffs' motion also demonstrate that a bowel injury is a rare complication of the surgery. Dr. Koebbe's affidavit states that the article and abstracts support his opinion that a bowel injury is an "unacceptable" complication, and so rare as to only occur as a result of surgical error.

But the trial court concluded that the article and the abstracts did not directly support Dr. Koebbe's opinion, as required by *Edry* and *Elher*.[21] The trial court found, and I agree, that the article submitted with Dr. Koebbe's affidavit merely documents that a perforated colon is a risk associated with an XLIF procedure. But nothing in the article suggests that all or any perforated colons that occur during such surgeries are the product of a violation of the standard of care. Simply put, the article merely stands for the proposition that lumbar spine surgeries akin to those performed on plaintiff are not risk free. One who submits to such a surgery should expect that a perforated colon will occur in .05% to 3.8% of all such procedures. The article does not conclude that because this potential risk is so low the risk will only occur when there is a breach of the medical standard of care. Having concluded that the medical literature submitted by plaintiff failed to support the notion that defendant breached the standard of care while performing surgery on plaintiff, the trial court properly found that "Dr. Koebbe's opinion was based solely on his experience and background,"[22]

---

about whether bowel injuries are only the result of a breach of the standard of care. In sum, the abstracts did not support Dr. Koebbe's opinion that plaintiff's bowel injury was caused by defendant's medical malpractice.

[21] *Id*.

[22] *Id*. at 1-2.

which are unacceptable and unreliable grounds for an expert's testimony.[23] Because "[e]xpert testimony must be directly supported by reliable principles and methods, and be generally supported by the relevant community of experts," the trial court denied the motion for reconsideration, finding Dr. Koebbe's testimony was not supported by anything.[24]

Plaintiff appealed the trial court's orders granting summary disposition and denying reconsideration. The Court of Appeals affirmed the trial court in an unpublished per curiam opinion. As an initial matter, the Court of Appeals noted: "The proponent of expert testimony in a medical malpractice case must satisfy the court that the expert is qualified under MRE 702, MCL 600.2955 and MCL 600.2169."[25] Thus, "MRE 702, as applied to the trial court's discharge of its gatekeeping role, 'requires the circuit court to ensure that *each aspect* of an expert witness's testimony, including the underlying data and methodology, is reliable.' "[26] The Court of Appeals acknowledged:

> In considering the medical opinion testimony of an expert in a malpractice case, our Supreme Court has held that "[a] lack of supporting literature, while not dispositive, is an important factor in determining the admissibility of expert witness testimony." Furthermore, "[u]nder MRE 702,

---

[23] See *Gilbert*, 470 Mich at 783 (" '[N]othing in either *Daubert* or the . . . Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.' "), quoting *Gen Electric Co v Joiner*, 522 US 136, 146; 118 S Ct 512; 139 L Ed 2d 508 (1997).

[24] *Danhoff II*, unpub op at 4.

[25] *Danhoff III*, unpub op at 4 (cleaned up). MCL 600.2169 provides additional criteria that an expert must satisfy before he or she may offer testimony in a medical malpractice case. Here, it is undisputed that Dr. Koebbe satisfies these requirements.

[26] *Danhoff III*, unpub op at 4-5, quoting *Elher*, 499 Mich at 22 (emphasis in *Danhoff III*).

it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." Consequently, standard of care experts, such as Dr. Koebbe, generally must base their standard of care expert testimony on something more than their experience and background.[27]

Applying the above-described law to the facts before it, the Court of Appeals held:

[A]t the summary dispositions stage, *the information before the trial court established that Dr. Koebbe's standard of care opinion was based solely on his own knowledge and experience. As such, Dr. Koebbe's opinion was not based on any methodology other than his bare assertion that he had never heard of such an injury, and therefore, he would conclude that any such injury was caused by malpractice.* But plaintiff, and by extension Dr. Koebbe, failed to establish that this opinion was shared by the broader medical community or that it was in any way a reliable method for identifying malpractice. *Indeed, and even apart from the application of the* Daubert *standard, Michigan has long held that the ipse dixit of an expert is insufficient to establish the standard of care in medical malpractice cases.* See *Ballance v Dunnington*, 241 Mich 383, 386-387; 217 NW 329 (1928) ("The standard of care, skill, and diligence required of an X-ray operator is not fixed by the ipse dixit of an expert, but by the care, skill, and diligence ordinarily possessed and exercised by others in the same line of practice and work in similar localities."). Furthermore, MRE 702 is not fulfilled by an expert simply having a methodology used to determine his or her expert opinion; rather, MRE 702 requires a showing that "the testimony is the product of *reliable* principles and methods." MRE 702 (emphasis added). Plaintiffs failed to make that showing. Consequently, at the summary disposition stage the trial court did not abuse its discretion, by concluding that Dr. Koebbe's testimony was inadmissible under MRE 702.[28]

The Court of Appeals further held that the trial court did not err by denying plaintiff reconsideration because, "[a]s explained by the trial court, the medical article and abstracts plaintiff[] provided did not actually directly support Dr. Koebbe's standard of care

---

[27] *Danhoff III*, unpub op at 5 (citations omitted).

[28] *Id*. at 7 (emphasis added).

opinion . . . ."[29] Therefore, the Court of Appeals concluded that it did "not see how [plaintiff] could possibly support an argument that Dr. Koebbe's standard of care opinion was the product of reliable principles and methods."[30] The Court of Appeals further concluded that "plaintiff[] still failed to establish that Dr. Koebbe's standard of care testimony was based on reliable methods," so summary disposition was appropriate.[31]

Plaintiff applied for leave to appeal in this Court. This Court heard oral arguments on the application before granting leave to appeal and directing the parties to brief:

> (1) whether this Court's decisions in *Edry* . . . and *Elher* . . . correctly describe the role of supporting literature in determining the admissibility of expert witness testimony on the standard of care in a medical malpractice case; (2) if not, what a plaintiff must demonstrate to support an expert's standard-of-care opinion; and (3) whether the appellants' standard-of-care expert met the standards for determining the reliability of expert testimony and was thus qualified to testify as an expert witness under MRE 702 and MCL 600.2955 or whether a *Daubert* hearing was necessary before making that decision.[32]

## II. ANALYSIS

As explained above, I agree with the majority opinion that MRE 702 and MCL 600.2955 govern the admissibility of expert testimony. I also agree with the majority that *Edry* and *Elher* properly interpreted MRE 702 and MCL 600.2955 and correctly described the standard that trial courts must apply to determine whether an expert's proposed

---

[29] *Id*. at 8.

[30] *Id*.

[31] *Id*.

[32] *Danhoff v Fahim*, 509 Mich 858, 858 (2022).

12

testimony is reliable and admissible.  As MCL 600.2955(1) provides, an expert's opinion is inadmissible "unless the court determines that the opinion is reliable and will assist the trier of fact."  In *Edry* and *Elher*, we held that scientific literature is not always required to support an expert's standard-of-care opinion.  Nevertheless, an expert may not generally rely solely on his or her own word to establish reliability.[33]  In *Gilbert*, we approvingly quoted the opinion of the Supreme Court of the United States in *Gen Electric Co v Joiner* that " 'nothing in either *Daubert* or the . . . Rules of Evidence requires a [trial] court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.' "[34]  Indeed, the parties do not cite any case—whether from this Court or the Court of Appeals—holding that a trial court abuses its discretion by excluding testimony from an expert whose sole claim to reliability and relevance is the expert's own ipse dixit.

Under MCL 600.2955(1), a trial court must consider seven factors to determine whether an expert's opinion is reliable.  Those factors are:

> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.

> (b) Whether the opinion and its basis have been subjected to peer review publication.

> (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

---

[33] *Edry*, 486 Mich at 642 ("Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible.").

[34] *Gilbert*, 470 Mich at 783, quoting *Joiner*, 522 US at 146.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

Dr. Koebbe failed to satisfy any of the seven factors. Dr. Koebbe did not provide any evidence that his opinion and its basis have been subjected to scientific testing and replication. In fact, he presented absolutely no evidence to support his contention that plaintiff's injury was the result of medical malpractice. The first statutory factor therefore clearly favors exclusion of Dr. Koebbe's testimony. The second factor also favors exclusion of Dr. Koebbe's testimony because, again, he provided no evidence that his opinion and its basis have been subjected to peer-reviewed publication. In plaintiff's motion for reconsideration, Dr. Koebbe provided the trial court with one study and three abstracts of studies, claiming they supported his opinion. But as the trial court noted, the study and the three abstracts of studies merely noted that plaintiff's injury is a rare complication of the XLIF procedure; they did not speak to whether plaintiff's injury is one that might result from medical malpractice. Thus, they did not support his opinion.

The third factor cuts against admission of Dr. Koebbe's testimony because he provided no evidence about the existence of generally accepted practices or procedures for the XLIF procedure or how defendant allegedly violated those accepted practices or

14

procedures. Further, Dr. Koebbe provided no evidence about the known or potential error rate of his opinion and its basis. Specifically, he did not provide evidence that he had conducted a study on the error rate of his opinion—i.e., how often an injury like plaintiff's occurs during an XLIF procedure without medical malpractice—and he did not provide evidence of any other such studies. As a result, the fourth factor also weighs against admission.

The fifth factor also counsels against admission of Dr. Koebbe's testimony. No evidence was presented that Dr. Koebbe's opinion was accepted by any other doctor or expert. As far as the trial court, the Court of Appeals, and this Court know, Dr. Koebbe may be the only doctor who believes that the injury plaintiff suffered during her XLIF procedure is the result of medical malpractice. Likewise, the sixth factor disfavors admission because—once again—Dr. Koebbe presented no evidence that experts in his field rely on the same basis—i.e., the rarity of the harm—to reach an opinion on medical malpractice. Last, the seventh factor cuts against admission because Dr. Koebbe presented no evidence about whether experts inside or outside the context of litigation rely on his opinion or methodology.

In sum, Dr. Koebbe gave the trial court nothing by which the court could possibly find that his opinion was reliable. Dr. Koebbe testified that defendant committed medical malpractice. He supported his testimony by stating that in his opinion defendant committed medical malpractice, a circular and self-proving logical proof. When the trial court invited Dr. Koebbe to expound upon the basis for his opinion, Dr. Koebbe shared only that the rarity of the harm necessarily means it resulted from medical malpractice. This is ipse dixit logic that has never been accepted in Michigan courts.

15

The majority opinion selectively quotes from the Court of Appeals and trial court's opinions, ignoring large swaths of text in which both courts explained that Dr. Koebbe did not offer *any* admissible evidence beside his own ipse dixit to show the reliability of his opinion. The majority opinion criticizes the lower courts for "focusing so strictly on plaintiff's inability to support Dr. Koebbe's opinions with published literature." But the lower courts focused on Dr. Koebbe's proffered medical articles because medical literature is an important factor, *and it was the only evidence Dr. Koebbe even attempted to offer to show that his opinion was reliable.* Had Dr. Koebbe offered other evidence to demonstrate the reliability of his opinion, I trust that the lower courts would have considered that evidence. But he did not. Left with nothing but his bare citation to three inapplicable studies and one inapplicable article, the trial court and the Court of Appeals were forced to examine only those writings before excluding Dr. Koebbe's testimony.

Notably, the majority opinion does not identify any record evidence that the lower courts failed to consider. Nor does it hold that any of the MCL 600.2955 factors support admission of Dr. Koebbe's testimony. In fact, the majority opinion does not even identify a single factor that supports the admission of Dr. Koebbe's proffered opinion. And the burden to prove or disprove the reliability of Dr. Koebbe's testimony does not rest on the lower courts, but on plaintiff.[35] All told, the majority opinion errs to the extent it criticizes the lower courts for focusing on the only evidence Dr. Koebbe offered, and it errs to the extent that it holds that the lower courts excluded Dr. Koebbe's testimony because he did not support his opinion with published literature.

---

[35] See MRE 702.

### III. CONCLUSION

The majority opinion erroneously holds that the trial court abused its discretion when, in fact, the trial court perfectly applied the law to the facts and reached a sound and correct result. Because the majority opinion reverses and disparages the trial court's sound exercise of discretion, I dissent.

Brian K. Zahra
David F. Viviano